UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

MICHAEL HORST,

        Plaintiff;

    v.

FLORIDA DEPARTMENT OF
CORRECTIONS; RICKY D. DIXON,
in his official capacity as Secretary of
the Florida Department of Corrections;
MADISON CORRECTIONAL
INSTITUTION, and WARDEN DAVID
ALLEN, in his official capacity as
Warden of Madison Correctional
Institution,

        Defendants.

Case No.

Demand for a Jury Trial

**VERIFIED COMPLAINT**
**For Reinstatement, Declaratory and Injunctive Relief, and Damages**

For his VERIFIED COMPLAINT for Reinstatement, Permanent Injunction,

Declaratory Relief, and Damages against Defendants, FLORIDA DEPARTMENT

OF CORRECTIONS; RICKY D. DIXON, in his official capacity as Secretary of the

Florida Department of Corrections; MADISON CORRECTIONAL INSTITUTION;

WARDEN DAVID ALLEN, in his official capacity as Warden of Madison

Correctional Institution (collectively "Defendants"), Plaintiff MICHAEL HORST ("Plaintiff" or "Senior Chaplain Horst"), alleges and avers as follows:

## NATURE OF THE ACTION

1.     Prior to the unlawful, unconstitutional, unconscionable, and wrongful termination alleged herein, Horst served as the Senior Chaplain of Madison Correctional Institution ("MCI"). Before joining MCI, Senior Chaplain Horst spent more than forty-years involved in ministry work, some part time, some full time, including serving as a youth pastor, missionary, worship leader, and professional gospel singer. Senior Chaplain Horst's most recent spiritual call was to serve as the Senior Chaplain at MCI, a call that Plaintiff does not feel has been completed.

2.     As one would expect of a Christian chaplain, Senior Chaplain Horst holds many sincere religious beliefs rooted in the Bible's passages and teachings. Christianity is more than Senior Chaplain Horst's career; it is his way of life. It is Senior Chaplain Horst's sincere desire to live his life for Jesus, which requires he live his life in close alignment with the Bible.

3.     The Bible clearly teaches, and thus Senior Chaplain Horst has sincerely held religious beliefs, that men and women have equal value before God, and that God shows no favoritism. An example of this equality is provided in the Acts of the Apostles: "Then Peter began to speak: 'I now realize how true it is that God does not

show favoritism but accepts from every nation the one who fears him and does what is right.'" *Acts* 10:34-35 (NIV).

4.    Senior Chaplain Horst has sincerely held religious beliefs that while the Bible emphasizes equality, it incontrovertibly implements gender roles within Christian ministries. These roles do not make men and women unequal before God, but rather direct each gender toward different purposes, all of which contribute towards glorifying God. This is observable in the first chapter of Paul's Epistle to Titus, which requires elders be men who are blameless, faithful to their wives, and have Christian children who are not wild or disobedient. *Titus* 1:6-9 (NIV). In the second chapter of Paul's Epistle, the older women are directed to teach the younger women of the church. *Titus* 2:1-8. The First Epistle of Timothy explicitly directs women not to teach men, or to usurp authority over them. *1 Timothy* 2:12-13 (KVJ). As a Christian minister, Senior Chaplain Horst has sincerely held religious beliefs that compel him to accepts these verses as truth and Scriptural commands, which he has no authority or ability to reject.

5.    Defendants, the Florida Department of Corrections ("DOC") and Ricky D. Dixon, Secretary of the DOC, operate the largest Florida State agency and one of the largest prison systems in the nation. Defendant, Madison Correctional Institution is one of the DOC's prisons, and it is led by Defendant, David Allen, the Institution's warden.

6.      In accordance with the commands of the United States Constitution and federal and state law, the DOC prisons provide inmates with religious services. To provide those constitutionally required services, the DOC employs religious chaplains.

7.      Each region of the State has a Regional Chaplain, who oversees several Senior Chaplains. Senior Chaplains lead OPS chaplains, volunteer chaplains, and coordinate with volunteer ministries to provide all religious services for the State's prisons.

8.      On October 25, 2024, Senior Chaplain Horst's supervisor and the DOC's Regional Chaplain instructed him to proctor Chaplain Jane Doe,[1] in some of Chaplain Doe's non-mandatory ministry training. The training was designed to teach the female chaplain how to minister to the men of MCI.

9.      The proctor role associated with this non-mandatory training required Senior Chaplain Horst to oversee Chaplain Doe's clinical work, which included monitoring her preaching and teaching to male prisoners, advising her on preaching with the unstated but obvious purpose of improving that preaching, and investing in her spiritual care.

---

[1] As her identity is not relevant to the claims herein, Senior Chaplain Horst refers to the female chaplain for whom he was assigned proctoring duties as Chaplain Jane Doe.

10.    Senior Chaplain Horst had previously supervised Chaplain Doe and oversaw several other female volunteers and spiritual leaders throughout his tenure at MCI.

11.    The current assignment that was given him, however, was qualitatively different under Senior Chaplain Horst's sincerely held religious beliefs.

12.    Senior Chaplain Horst had never been asked to affirm a practice contrary to his faith, and he *could not* affirm a practice that plainly conflicted with his sincerely held religious beliefs.

13.    On the basis of his sincerely held religious beliefs grounded in the above-referenced passages of *Titus* and *Timothy*, among other Scriptures, Senior Chaplain Horst was compelled to abstain from proctoring training that instructs a female to teach and preach to men. Female chaplains ministering to males is a practice that directly contradicts Scripture and Senior Chaplain Horst's sincerely held religious beliefs.

14.    On the basis of his sincerely held religious beliefs, Senior Chaplain Horst requested religious accommodation that would permit him to comply with his employments roles and requirements but also conform his conduct to his beliefs.

15.    Specifically, Senior Chaplain Horst's religious accommodation request was that one of the DOC's dozens of other competent and qualified chaplains proctor Chaplain Doe's non-mandatory training.

16.    Senior Chaplain Horst had anticipated and hoped that a chaplain from a faith group that permitted female leadership in ministry would gladly accept the role.

17.    Senior Chaplain Horst suggested, as part of his religious accommodation request, that should no other chaplain be able to proctor Chaplain Doe's non-mandatory training, that his own supervisor, an Assistant Warden at MCI who was qualified and competent to proctor the training remove him from the assignment as an accommodation and take over the proctoring.

18.    Senior Chaplain Horst's leadership attempted to convince him that his religious beliefs were inconsistent with the Bible, hypocritical, and incorrect.

19.    The Regional Chaplain attempted to engage in a scriptural debate with Senior Chaplain Horst about this conflict, and Senior Chaplain Horst's supervisor took the approach of highlighting what she perceived as hypocrisy, noting that Senior Chaplain Horst had supervised female chaplains, so it did not make sense that he would not serve as one of their proctors for ministry training.

20.    Senior Chaplain Horst's supervisors even attempted to simplify the proctoring assignment to a mere signing of timesheets to confirm that Chaplain Doe completed her assignments and clinical work, despite that direction explicitly contradicting the training's curriculum.

6

21.    Despite his superiors' constant efforts to convince him of the inappropriateness of his religious beliefs, Senior Chaplain Horst remained steadfast in his beliefs and refused to compromise on his sincerely held convictions.

22.    Knowing that the assignment involved mentorship, Senior Chaplain Horst requested that, if the assignment were to be simplified to merely signing timesheets concerning Chaplain Doe's religious ministry training, that the Assistant Warden take on the task of signing those time sheets so that he would not have to violate his sincerely held religious beliefs.

23.    Senior Chaplain Horst's request for such accommodation was neither a hardship, nor undue. In fact, it was eminently reasonable, available, easily accommodatable, and practical for all involved.

24.    Senior Chaplain Horst's request for a religious accommodation was denied without consideration.

25.    In fact, Senior Chaplain Horst's requested accommodation was met with vitriol, condemnation, rejection and ultimately an ultimatum: proctor Chaplain Doe's religious ministry training in violation of your own sincerely held religious beliefs or resign.

26.    When faced with that choice, Senior Chaplain Horst informed his superiors that under such a scenario, he would be compelled to resign, but accepted his supervisor's plea to consider the matter prayerfully before making that decision.

27.    Senior Chaplain Horst spent the next few hours praying and seeking counsel from the Lord. He realized that his call to serve the men of MCI had not yet expired. After prayer, reflection, and a consideration of his own sincerely held religious convictions, Senior Chaplain Horst informed his supervisors via email that he would neither proctor the training nor resign but would continue to lead his flock.

28.    In that same email communication to his leadership, Senior Chaplain Horst reiterated his request for a religious accommodation from the employment assignment that conflicted with his sincerely held religious beliefs.

29.    In direct response to Senior Chaplain Horst's accommodation request, Defendants placed him "under investigation" and transferred him to another institution.

30.    Yet, as it turned out, there was no investigation but rather an inquisition designed to eliminate him from the ranks of the DOC, and that is precisely what happened.

31.    Shortly after his transfer, Senior Chaplain Horst filed an incident report claiming religious discrimination. Instead of seriously considering the requirements of the First Amendment, the Florida Religious Freedom Restoration Act, Title VII of the Civil Rights Act, or any other law plainly protecting Senior Chaplain Horst's ability to maintain a living and conform his conduct to his faith, Defendants

unceremoniously, unconscionably, and unlawfully terminated Senior Chaplain Horst for the mere act of requesting an accommodation that the law demands.

32.    Defendants provided Plaintiff notice that he was terminated for advising that he "would rather resign than supervise a female staff member for the ICPT training classes due to [his] religious belief that a woman should not be in a role over a man." A true and correct copy of Plaintiff's Final Action Letter for Disciplinary Action – Dismissal is attached hereto as EXHIBIT 1 and incorporated herein.

33.    The Final Action Letter continues alleging that Plaintiff, "on multiple occasions" refused "to supervise and train a female staff member." Ex. 1.

34.    To add salt to Senior Chaplain Horst's injury, Defendants – immediately upon terminating Senior Chaplain Horst – proceeded to adopt the very accommodation he had suggested as a way of protecting both his own religious beliefs and allowing Chaplain Doe to receive her non-mandatory ministry training without delay.

35.    After Senior Chaplain Horst was transferred, the Regional Chaplain began screening the religious beliefs of applicants for the Senior Chaplain position at MCI to ensure none of the applicants for Senior Chaplain Horst 's position shared Senior Chaplain Horst 's religious beliefs.

36.     Consistent with federal and state law, Senior Chaplain Horst informed Defendants of his bona fide religious objection and of the conflict between his religious convictions and his purported employment requirements. Senior Chaplain Horst sought in good faith a reasonable accommodation for his sincere religious beliefs that caused no undue hardship to the institution. Defendants refused to consider Senior Chaplain Horst's religious accommodation request. Rather, Defendants treated Senior Chaplain Horst's request as insubordination, willful violation of rules and directives, conduct unbecoming a public employee, violation of state statutes, rules, directives, policy statements, among other egregious and outlandish offenses entirely unassociated with Senior Chaplain Horst's request. Ex. 1.

37.     Critically, Senior Chaplain Horst had no desire to jeopardize the mission of the institution, Chaplain Jane Doe's career, or discriminate against any individual. He merely asked his employer to follow Florida law and Title VII by reasonably accommodating his bona fide religious beliefs as they relate to this non-mandatory training. Accommodating Senior Chaplain Horst's religious beliefs would have caused Defendants no undue hardship because Defendants implemented Senior Chaplain Horst's requested accommodation immediately after unlawfully transferring him to another prison.

38.    Defendants' unlawful denial of Senior Chaplain Horst's reasonable accommodation request cannot be harmonized with the requirements of Title VII or Florida law. Defendants ignored the requirements of the law and retaliated against Senior Chaplain Horst when he reported the discrimination. Senior Chaplain Horst has suffered irreparable First Amendment injury and damages, reputational damage, financial harm, and continues to suffer harm each day he is separated from his calling and besmirched by the State. Defendants continue to discriminate based on religion through newly implemented hiring practices that blatantly violate Title VII and the First and Fourteenth Amendments. It is for these wrongs that Senior Chaplain Horst requests relief.

## EXHAUSTION OF REMEDIES

39.    Senior Chaplain Horst has exhausted all administrative remedies and is entitled to bring this action. Senior Chaplain Horst participated in Florida's Administrative Career Service Appeal process, resulting in the Public Employees Relations Commission affirming Senior Chaplain Horst's dismissal. All conditions precedent to filing claims under Title VII and the Florida Civil Rights Act, Fla. Stat. §760.11, have been performed or have occurred.

40.    Senior Chaplain Horst filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC closed its file and transferred the Charge of Discrimination to the Department of Justice for

issuance of a Notice of Right to Sue on June 18, 2025. Senior Chaplain Horst has waited a sufficient time without receipt of his Notice of Right to Sue and is thus presumed to have exhausted his remedies and is entitled to bring his claims in this Court.

## PARTIES

41.    Plaintiff, Michael Horst, served as the Senior Chaplain of MCI prior to his unlawful termination. Plaintiff is a lifelong servant of Christ with more than forty-years of ministry work as a gospel singer, youth pastor, and missionary.

42.    Defendant, Florida Department of Corrections, is headquartered in Tallahassee, Florida. The Department is an "employer" within the meaning of Title VII because it has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

43.    Ricky D. Dixon is the Secretary of the Florida Department of Corrections and is the chief executive of the Department, responsible for the implementation, enforcement, and execution of the Department's policies and procedures. Dixon is sued in his official capacity.

44.    Madison Correctional Institution is located in Madison, Florida. MCI is an employer within the meaning of Title VII because it has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

45.     David Allen is the Warden of MCI. He is the chief executive of MCI, responsible for the implementation, enforcement, and execution of tis policies and procedures. Allen is sued in his official capacity.

## JURISDICTION AND VENUE

46.     This action arises under the Constitution and laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the First and Fourteenth Amendments to the United States Constitution. This action is brought under 42 U.S.C. §1983.

47.     This Court has jurisdiction over this action under 28 U.S.C. §1331, §1343, and 42 U.S.C. §2000e-5(f).

48.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) and 42 U.S.C. §2000e-5(f) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

49.     This Court may grant the requested declaratory relief under the Declaratory Judgement Act, 28 U.S.C. §§2201 and 2202, implemented through Rule 57, Federal Rules of Civil Procedure, and the requested injunctive relief under 42 U.S.C. §2000e-5(g)(1), 28 U.S.C. §2202, and Rule 65, Federal Rules of Civil Procedure.

50.     This Court may grant Plaintiff's prayer for damages pursuant to 42 U.S.C. §1983 and 42 U.S.C. §2000e-5(g), and Fed. R. Civ. P. 54 for their prayer for

costs and expenses, including reasonable attorneys' fees and costs, under 42 U.S.C. §2000e-5(k) and 42 U.S.C. §1988.

## FACTUAL ALLEGATIONS

**I.   Defendants Employed Plaintiff as a Senior Chaplain at MCI.**

51.   Senior Chaplain Horst is first and foremost a Christian. He has been involved in Christian Ministry throughout his adult life. He received two college ministry degrees from renowned Chrisitan universities and went on to serve as a pastor, gospel singer, and chaplain.

52.   When Senior Chaplain Horst moved to Madison, Florida, he had no intention of serving as a prison Chaplain. Chaplain J.M. met Senior Chaplain Horst at church and encouraged him to get involved in prison ministry. In 2023, while Senior Chaplain Horst was preparing to volunteer at MCI, Defendants offered Senior Chaplain Horst the role of Senior Chaplain at the institution. Senior Chaplain Horst prayed about the opportunity and, through prayer, determined that God had called him to full-time prison ministry.

53.   On April 7, 2023, Senior Chaplain Horst was officially hired by the Florida Department of Corrections in the position of Senior Chaplain and was onboarded at Madison Correctional Institution.

54.   Shortly after arriving at MCI, Senior Chaplain Horst met Amelia Hill, the former Warden of the institution, along with Warden Hill's two assistant wardens,

S.B. and E.H. As a Senior Chaplain, Plaintiff also reported to A.H. the Regional Chaplain for Region 2, which encompasses, among other cities, Madison, Florida.

55.    Initially, Senior Chaplain Horst had only one employee and several volunteers under his charge. The one employee was Other Personnel Services ("OPS") Chaplain J.M., the same chaplain that recruited Senior Chaplain Horst to join MCI. There were several male and female volunteers that regularly assisted at MCI.

56.    Senior Chaplain Horst was tasked with managing MCI's chapel and its many faith-based programs. This included scheduling representatives of other faiths, including female ministers, to utilize MCI's chapel to minister to the men of MCI.

57.    Senior Chaplain Horst has never discriminated against a female minister, nor even attempted to persuade a female minister that their beliefs are incorrect.

58.    Senior Chaplain Horst had a good working relationship with the many spiritual leaders that volunteered at MCI.

59.    While Senior Chaplain Horst oversaw Chaplain J.M., he did not manage Chaplain J.M.'s time sheets or vacation requests, nor was he trained to complete these administrative tasks. Instead, they were completed by Assistant Warden S.B.

## II.    Defendants Hired a Female Chaplain to Serve as MCI's OPS Chaplain.

60.    Approximately six months after Defendants hired Senior Chaplain Horst, OPS Chaplain J.M. retired. OPS Chaplain J.M. continued to serve as a volunteer chaplain at the Institution, but his retirement opened up the OPS Chaplain position at MCI.

61.    Defendants hired OPS Chaplain Jane Doe, a female, to replace Chaplain J.M.

62.    Before Defendants hired Chaplain Jane Doe, Senior Chaplain Horst informed Regional Chaplain A.H. that his sincerely held religious beliefs do not allow him to assign Jane Doe to minister to the men of MCI, but that he could supervise her.

63.    Regional Chaplain A.H. initially implied to Senior Chaplain Horst that Chaplain Jane Doe's duties would not include ministering to male prisoners. Instead, Chaplain Jane Doe's role would focus on managing the prisoner's religious diets and handling administrative tasks for the chapel.

64.    Eventually, OPS Chaplain Jane Doe was assigned to minister to male prisoners; however, Defendants accommodated Senior Chaplain Horst's religious beliefs. Another employee assigned Chaplain Jane Doe to minister to the male prisoners, instead of Senior Chaplain Horst.

16

**III. OPS Chaplain Jane Doe Requested Senior Chaplain Horst Serve as Her Proctor for Ministry Training.**

65. Defendants sponsor chaplains to participate in the Institute for Clinical Pastoral Training's (ICPT) ministry training.

66. Chaplain Jane Doe applied to participate in ICPT's Clinical Pastoral Education ("CPE") program. ICPT CPE is described as an opportunity for "students to expand their chaplaincy knowledge and experiences into professional settings[.]" A true and correct copy of the ICPT CPE Training Guide is attached hereto as EXHIBIT 2 and incorporated herein.

67. "CPE training at ICPT expands access to interdisciplinary settings by teaching student from diverse faith to offer spiritual care to a multi-faith population in a manner that is authentic to their own beliefs while respecting and being mindful of their clients' faith." Ex. 2.

68. ICPT CPE consists of 400 clock-hours of education and clinical work and is scheduled to take 12 weeks for full-time students and 24 weeks for part-time students. Ex. 2.

69. ICPT CPE proctors are required to establish a student-preceptor/proctor relationship, and that relationship is meant to provide CPE students with "an opportunity to practice their newly acquired skills under the guidance of expert professionals." Ex. 2.

70.    It is the proctor's responsibility to ensure that the clinical site provides the "students with opportunities that allow students to demonstrate satisfactory completion of clinical learning objectives and clinical learning outcomes." Ex. 2.

71.    Those objectives include developing "awareness of themselves as ministers and of the way their ministry affects persons;" accessing "information and resources on a wide range of spiritual care services;" and engaging "in peer review and supervisory consultation and receive critique about one's ministry practice." Ex. 2.

72.    All these objectives involve supervising a female chaplain ministering to male prisoners, a practice that conflicts with Senior Chaplain Horst's bona fide religious beliefs.

73.    ICPT CPE is not mandatory training. It is entirely voluntary.

74.    On October 22, 2024, OPS Chaplain Jane Doe sought to participate in ICPT CPE to improve her ministry; however, she was unable to submit her application without a faith leader referral form and a clinic site agreement.

75.    Chaplain Jane Doe was required to locate a proctor for her training. She emailed Chaplain B.B., a chaplain at Defendants' central office in Tallahassee, for further guidance regarding finding a proctor. A true and correct copy of the email communications between Chaplain Jane Doe and Chaplain B.B. are attached hereto

as EXHIBIT 3 and incorporated herein. A true and correct copy of Chaplain Jane

Doe's Incident Report is attached hereto as EXHIBIT 4 and incorporated herein.

76.    On October 23, 2024, Chaplain B.B. provided Chaplain Jane Doe the

following advice for locating a proctor:

> Chap – Your Faith Leader should probably be someone from your
> church or denomination. The Site Agreement should be done by
> [Assistant Warden S.B.], designating your facility as the clinical site
> and her as your proctor. If she's concerned about that, [Senior Chaplain
> Horst] could be your proctor. It just needs to be someone on site.

Ex. 4.

77.    That same day, OPS Chaplain Jane Doe responded, "Thank you, I will

forward this to her if either of them have a concern. Thanks again." Ex. 4.

78.    Chaplain Jane Doe forwarded her email correspondence with Chaplain

B.B. to Senior Chaplain Horst and Assistant Warden S.B. with the message,

"Pertaining to the site agreement request being filled out by either of you. Thank

you." A true and correct copy of the email communications between Chaplain Jane

Doe, Assistant Warden S.B. and Senior Chaplain Horst are attached hereto as

EXHIBIT 5 and incorporated herein.

79.    There was no additional content in the message. If this email can be

interpreted as a request for either Assistant Warden S.B. or Senior Chaplain Horst to

serve as Chaplain Jane Doe's proctor, this was the first instance in which she

requested Senior Chaplain Horst assist with her ministry training.

80.    Assistant Warden S.B. did not respond to Chaplain Jane Doe's email.

81.    Senior Chaplain Horst interpreted Chaplain Jane Doe's email as a request for him to serve as her proctor for ministry training, which he viewed as imposing a direct conflict with his sincerely held religious beliefs.

82.    Senior Chaplain Horst served as Chaplain Jane Doe supervisor for over a year, but he *could not* endorse, supervise, and train a female to minister to male prisoners due to his sincere religious convictions.

83.    Despite this conflict, Senior Chaplain Horst did not want to discourage Chaplain Jane Doe from seeking the training, so he decided to meet with Chaplain Jane Doe and explain to her that, while he could not serve as her proctor, leadership was aware of his religious beliefs and could locate another proctor.

84.    Senior Chaplain Horst did not attempt to convince Chaplain Jane Doe that her religious beliefs were incorrect, nor did he deter her from participating in the training.

85.    In fact, Senior Chaplain Horst was aware that Chaplain Jane Doe had also requested Assistant Warden S.B. to serve in the same proctor capacity and expected that she would do so.

86.    This conversation was calm, no one raised their voice, neither party got upset, nor did they have any significant emotional reaction.

87.     Chaplain Jane Doe did not want Senior Chaplain Horst to violate his sincerely held religious beliefs. The conversation between Plaintiff and Chaplain Jane Doe ended cordially with a hug. Ex. 4.

88.     Both Senior Chaplain Horst and Chaplain Jane Doe agreed that other employees would be able to serve as Chaplain Jane Doe's proctor, thus she went off to locate another proctor. Ex. 3.

89.     Later that day, Chaplain Jane Doe sent a follow-up email to Central Office Chaplain B.B. stating:

> I sent it to both [Assistant Warden S.B.] and [Plaintiff], [Plaintiff] was honest with me, He shared his concern with my being hired in this position, he wasn't favorable of it and it was above him that I was hired and he would rather resign than to supervise a woman that over men, it's out of the order of God, and to ask him to oversee me in this ICPT class, is very much against his belief in Christ pertaining to women and their role, I thought about complaining but he said our Ward of programs is aware, and that he had express his belief to [Regional Chaplain A.H.], This explains why he don't know how or what to when I have questions so I have to consult another chaplain or try and figure it out. Can anyone else complete the Training site agreement like [Mr. A.] or [Dr. B.] in education, [Regional Chaplain A.H.] once he's back from vacation, [Chaplain J.M.] has agreed to complete if its ok, let me know how I should proceed. /sic/

Ex. 3.

**IV.    Chaplain Jane Doe and Senior Chaplain Horst Both Agree that Accommodations Were Available that Respect Senior Chaplain Horst's Religious Beliefs and Provide Chaplain Jane Doe a Proctor, Without Undue Hardship.**

90.    Notably, there was some confusion among Defendants' staff about who should serve as Chaplain Jane Doe proctor.

91.    The DOC central office recommended that either Assistant Warden S.B. or Senior Chaplain Horst serve as Chaplain Jane Doe proctor.

92.    Chaplain J.M. believed that Regional Chaplain A.H. should have served as Chaplain Jane Doe proctor. Regional Chaplain A.H. thought Senior Chaplain Horst should be compelled to serve as Chaplain Jane Doe proctor. And Central Office Chaplain B.B. believed many other chaplains in the region were available to fill the proctor role instead of Senior Chaplain Horst.

93.    On October 25, 2024, Chaplain B.B. responded to Chaplain Jane Doe email:

> Chap – I'm sorry to hear that. Please discuss your options with [Regional Chaplain A.H.] and [Assistant Warden S.B.]. I would think an on-site employee would be preferable to an off-site or volunteer, but let's do whatever's necessary.

A true and correct copy of the email communications between Chaplain B.B., Chaplain Jane Doe, Assistant Warden S.B., and Regional Chaplain A.H. are attached hereto as EXHIBIT 6 and incorporated herein.

94.    Chaplain B.B. then emailed Assistant Warden S.B. and Regional Chaplain A.H. the ICPT CBE proctor requirements and responsibilities, along with the following message:

> Having anyone other than the Senior Chaplain assume this role is unwise, and I strongly encourage you to clarify with [Plaintiff] the necessity of this role as a function of his job. As Senior Chaplain, he is best suited to the responsibility. Any other staff member will not have the training or proximity to be effective.

Ex. 6.

95.    Chaplain B.B, provided some additional context to this email noting that he did not believe his email would lead to Senior Chaplain Horst's dismissal, but rather would lead to a conversation that would accommodate everybody's limitations. While it is ideal for proctors to serve at the same institution as their projector, chaplains may have their assistant wardens sign their weekly clinic hour log and receive spiritual investment from a chaplain at another institution.

96.    For example, there are institutions with only one chaplain, so if those chaplains seek to participate in ICPT CPE, the central office will locate a proctor at another institution to assist with the training. The same is true for Senior Chaplains, as they, too, can participate in ICPT CPE, and be matched with a proctor from another institution.

97.    Chaplain J.M. believed that Regional Chaplain A.H. should have served as Chaplain Jane Doe proctor. However, Chaplain J.M. was also willing and able to proctor Chaplain Jane Doe's ICPT CPE.

98.    Despite the ICPT CPE training guide explicitly explaining the proctor role, Regional Chaplain A.H. believed that the proctor's only responsibility was to sign the student's weekly clinical hour log, a de minimis task.

99.    Nevertheless, he still believed that Senior Chaplain Horst should be compelled to serve as Chaplain Jane Doe proctor despite his religious beliefs and the perceived de minimis nature of the proctor's role.

100.   While Assistant Warden S.B. never responded to Chaplain Jane Doe request to serve as her projector, she considered herself too busy for the role.

101.   Ultimately, Regional Chaplain A.H. and Assistant Warden S.B. agreed, among each other, that they should compel Senior Chaplain Horst to serve as Chaplain Jane Doe proctor.

## V.    Senior Chaplain Horst's Leadership Presented Him an Ultimatum: Abandon Your Religious Beliefs or Resign.

102.   On the morning of October 25, 2024, Regional Chaplain A.H. drove from Mayo Annex, another DOC facility, to MCI to meet with Assistant Warden S.B. about this situation. These two leaders agreed to confront Senior Chaplain Horst in

his office. Neither A.H. nor S.B. considered alternative options to accommodate Senior Chaplain Horst 's religious beliefs.

103.   Regional Chaplain A.H. has explicitly stated his beliefs  that chaplains should not request religious accommodation and instead should choose to do their job or resign.

104.   Assistant Warden S.H. and Regional Chaplain A.H. implemented that unlawful policy and went to Senior Chaplain Horst's office to require his compliance with their order that he serve as Chaplain Jane Doe proctor.

105.   They entered Senior Chaplain Horst's office, shut the door behind them, and informed Senior Chaplain Horst that he was required to proctor Chaplain Jane Doe's non-mandatory ICPT CPE, despite his religious beliefs.

106.   No consideration was given to Senior Chaplain Horst's sincere religious beliefs, and no attempt was made to discuss an accommodation of those sincere religious beliefs.

107.   Senior Chaplain Horst attempted to talk down his leaders. He explained that he so sincerely held his religious beliefs that he *could not* proctor Chaplain Jane Doe's training.

108.   Senior Chaplain Horst explained that by serving as Chaplain Jane Doe's proctor he would be placing his stamp of approval on a practice that conflicts with the Bible. He made clear that he would rather resign than violate his sincerely held

religious beliefs. Ex. 1. A true and correct copy of Senior Chaplain Horst's Incident Report is attached hereto as EXHIBIT 7 and incorporated herein.

109.   Senior Chaplain Horst testified about this conflict at great length at his state administrative hearing and articulated clearly the sincerity of his religious convictions that had been articulated to Defendants.

110.   Instead of attempting to accommodate Senior Chaplain Horst's religious beliefs, Regional Chaplain A.H. engaged in a theological debate with Senior Chaplain Horst, attempting to convince Senior Chaplain Horst that he had incorrectly interpreted the Bible.

111.   Regional Chaplain A.H. informed Senior Chaplain Horst that he believed he was a hypocrite for scheduling ministers of many faiths to preach at the chapel but remaining unwilling to proctor Chaplain Jane Doe training. Regional Chaplain A.H. also questioned the sincerity of Senior Chaplain Horst's religious beliefs.

112.   At the end of the theological debate, the group found itself at an impasse. Senior Chaplain Horst informed the leaders that he felt as if he had no choice but to resign.

113.   Regional Chaplain A.H. told Senior Chaplain Horst that he would be allowed to remain at the institution for two weeks before his resignation was deemed

effective. However, Assistant Warden S.B. jumped in to note that she did not want Senior Chaplain Horst to resign and asked him to reconsider his position.

114.    Senior Chaplain Horst agreed to rethink his decision. With that, Regional Chaplain A.H. and S.B. departed Plaintiff's office.

115.    Senior Chaplain Horst sought counsel from the Lord through prayer and reflection on Scripture.

116.    After several hours, Senior Chaplain Horst determined that he remained called to minister to the men of MCI and, therefore, would not resign.

117.    At 2:48pm on October 25, 2024, Senior Chaplain Horst sent the following email to Regional Chaplain A.H. and Assistant Warden S.B. to inform them of his decision:

> I listened to your words of counsel this morning about taking some time to think about my decision and I have done so. I have decided to continue to do my job and serve here in the chapel in every way that I possibly can as I have been, but when I am told that I must perform duties that violate my strongly held religious beliefs, I now as always must in those circumstances obey God rather than man. I do so not to make this decision, especially when other provisions could have been made to accommodate my strongly held religious beliefs, but for me God's commandments must always take precedence over man's commandments. I will continue to serve in my capacity as a Senior Chaplain at Madison CI in every way that I possibly can as I have been doing until the Prison administration decides that I am no longer able to serve in my capacity in accordance with their determined needs for the chapel.

A true and correct copy of the email communications between Senior Chaplain Horst, Assistant Warden S.B., and Regional Chaplain A.H. (the subject of Senior Chaplain Horst's dismissal) are attached hereto as EXHIBIT 8 and incorporated herein.

118. This email served as Senior Chaplain Horst's written and formal request for religious accommodation.

119. Despite Senior Chaplain Horst's request, neither Regional Chaplain A.H. nor S.B. directed Senior Chaplain Horst to Defendants' accommodation coordinator.

120. Neither Regional Chaplain A.H. nor S.B. engaged in an interactive accommodation process with Senior Chaplain Horst, and neither attempted to reach any reasonable accommodation for Senior Chaplain Horst's religious beliefs.

**VI.    Instead of Assisting Her Employee with His Accommodation Request, Assistant Warden S.B. Filed an Incident Report Alleging that Senior Chaplain Horst was Insubordinate.**

121. Despite Senior Chaplain Horst's request, neither Regional Chaplain A.H. nor S.B. directed Senior Chaplain Horst to Defendants' accommodation coordination.

122. Instead of engaging in the legally required interactive accommodation process with Senior Chaplain Horst, Assistant Warden Bearden filed an incident report alleging that Senior Chaplain Horst's request for religious accommodation

had "the appearance of discrimination and insubordination." A true and correct copy of Assistant Warden S.B.'s First Incident Report is attached hereto as EXHIBIT 9 and incorporated herein. A true and correct copy of Assistant Warden S.B.'s Second Incident Report is attached hereto as EXHIBIT 10 and incorporated herein.

123.    Assistant Warden S.B. describes Senior Chaplain Horst's perceived "wrongdoing" as "refuse[ing] to oversee Chaplain [Jane Doe] in the ICPT training class[.]" Exhibit 9.

124.    The incident report reiterates that Senior Chaplain Horst's objection to proctoring Chaplain Jane Doe training was based on his sincerely held religious beliefs. Ex. 9.

125.    According to Assistant Warden S.B., the phrases "appearance of discrimination" and "appearance of insubordination" generally refer to discrimination and insubordination, but she does not have the authority to determine whether Senior Chaplain Horst's actions meet the definitions of discrimination or insubordination. Instead, the report merely captured her opinion.

126.    Warden Hill was not present at MCI on October 25, 2024, and Assistant Warden E.H. was serving as Acting Warden.

127.    Assistant Warden E.H. did not have an opportunity to review the incident report until Monday, October 28, 2024.

128.   On October 28, 2024, Assistant Warden S.B. requested that Regional Chaplain A.H. also file an incident report. A.H. complied with S.B.'s request and submitted one that day. A true and correct copy of Regional Chaplain A.H.'s Incident Report is attached hereto as EXHIBIT 11 and incorporated herein.

129.   S.B. reviewed Regional Chaplain A.H.'s incident report and provided her own comments in the "Supervisor Comments" section of the form. She suggested the report be forwarded to "Human Relations for discipline/termination due to discrimination and insubordination." Ex. 11.

130.   Assistant Warden E.H. reviewed both incident reports but was unable to determine whether the incident involved *actual* discrimination or insubordination, thus he forwarded the reports to Defendants' Inspector General's office.

131.   The DOC IG office investigates any *credible* report of discrimination and, once the investigation is complete, provides the final investigation report to the warden of the subject prison. If the report is not credible, the DOC IG will not conduct an investigation.

132.   Chaplain Jane Doe was directed to make a report with the U.S. Equal Employment Opportunity Commission ("EEOC").

**VII.    In Response to Senior Chaplain Horst's Request for Religious Accommodation and Assistant Warden S.B.'s Incident Report, Senior Chaplain Horst was Transferred to Another Prison and Placed Under Investigation.**

133.   After Assistant Warden E.H. received Assistant Warden S.B.'s incident report, he took adverse employment action against Senior Chaplain Horst and directed MCI's security team to prevent Senior Chaplain Horst from entering the prison, or his office.

134.   When Senior Chaplain Horst arrived at work, he was directed to an administrative building outside of the institution's walls, to wait for further instruction.

135.   Senior Chaplain Horst, now aware that he was being discriminated against for his religious beliefs, filed an incident report against Assistant Warden S.B. and Regional Chaplain A.H. The report reads:

> [Regional Chaplain A.H.] and [Assistant Warden S.B.] told me that they needed to meet with me in my office. They proceeded to ask me if I was not willing to sign a document and agree to a proctor for [Chaplain Jane Doe] who was hired by MCI administration to be the OPS Chaplain. I reminded them that when she was hired, Warden Hill came into my office before [Chaplain Jane Doe] start date and she asked me if I would have any problem with [Chaplain Jane Doe] being the OPS chaplain. I told her that it went against my strongly held religious beliefs to have a woman in this position. I assumed that Warden Hill was going to let me go over this issue but she did not. I made it clear that I could not manage her as a Chaplain since it would force me to compromise my religious convictions. The incident on the 25th was that I was told that I must sign the document and be her proctor even though the email that

> [Assistant Warden S.B.] and I received was asking [Assistant Warden S.B.] to sign it and be the proctor. She clearly has no religious convictions that would forbid her to do so but I do and administration has known that about me for my entire employment.

Ex. 7.

136.    Despite being the alleged offender, Assistant Warden S.B. reviewed Senior Chaplain Horst's incident report and provided the following supervisory comments:

> [Central Chaplain B.B.] advised that 'having anyone other than the Senior Chaplain assume this role is unwise, and I strongly encourage you to clarify with [Senior Chaplain Horst] the necessity of this role as a function of his job. As Senior Chaplain he is best suited to the responsibility. Any other staff member will not have the training or proximity to be effective.' When [Senior Chaplain Horst] was advised of this he stated this does not change my mind. If it was a man I would gladly do it, but I am not doing it for a woman. This incident was referred to Human Resources.

Ex. 7.

137.    On October 29, 2024, Assistant Warden E.H. met with Senior Chaplain Horst and informed him that he was being placed under investigation and would be immediately transferred to Hamilton Correctional Institution ("HCI"). In other words, rather than attempting to find a reasonable accommodation required by Title VII, Defendants took further adverse employment actions against Senior Chaplain Horst for attempting to obtain a legally required religious accommodation.

138.    Senior Chaplain Horst was not informed of the allegations made against him but was forced to sign transfer paperwork without any additional information.

139.    According to E.H., Defendants' employees cannot refuse a transfer related to an ongoing disciplinary investigation. Defendants considered Chaplain Jane Doe to be a "victim" and, according to E.H. victims are never transferred to other institutions.

140.    According to Defendants, Senior Chaplain Horst had to be transferred to avoid possible retaliation or tainting of evidence in case there was an IG investigation.

141.    When Defendants receive a report of discrimination, they must generate a MINS report.

142.    A MINS report was generated for Assistant Warden S.B.'s Incident Report, but not Senior Chaplain Horst's report. In other words, Defendants ignored their own internal policies relating to incident reports, but only as it related to Senior Chaplain Horst.

143.    Defendants considered Senior Chaplain Horst's report to be a related report to S.B.'s report, but Senior Chaplain Horst's Incident Report was not categorized, reported, or handled as a report of discrimination.

144.    Senior Chaplain Horst was treated exclusively as an offender, rather than a victim of discrimination.

145.   On October 31, 2024, Assistant Warden S.B. reached out to Chaplain Jane Doe and requested she file an incident report.

146.   At this time, Chaplain Jane Doe was unaware that Senior Chaplain Horst had been transferred to another prison or placed under investigation.

147.   Chaplain Jane Doe filed an incident report against Senior Chaplain Horst. The report includes the following: "[O]nce he was done, I gave him a hug and went back to my office and emailed Chaplain Beauchamp because from that conversation, I didn't want to put him in a position against his belief." Ex. 4.

148.   The report also includes additional incidents of "discrimination" unknown to Defendants prior to subjecting him to disciplinary action and unlawful transfer to HCI.

149.   Specifically, Chaplain Jane Doe alleged that Senior Chaplain Horst ignored her vacation requests, refused to train her on multiple occasions, and yelled at her in front of an inmate and Chaplain J.M. Ex. 4.

150.   These post hoc allegations were disproved during the Public Employees Relations Commission ("PERC") Career Service Appeal evidentiary hearing regarding this incident.

151.   During the Career Service Appeal, Chaplain J.M. testified that Chaplain Jane Doe allegations were false. Specifically, he testified that he never heard Senior Chaplain Horst yell at Chaplain Jane Doe.

152.    Additionally, Senior Chaplain Horst was never in charge of handling Chaplain Jane Doe's vacation requests.

153.    Assistant Warden S.B. handled vacation requests for both Senior Chaplain Horst and Chaplain Jane Doe.

154.    She handled these same requests for Chaplain J.M. when he was employed at MCI as well.

155.    Senior Chaplain Horst has never been in charge of this administrative task, nor was he trained to handle them.

156.    Senior Chaplain Horst testified that he had not previously refused to train Chaplain Jane Doe as she had alleged in her report.

157.    Regardless of the truthfulness of Chaplain Jane Doe's allegations, and Senior Chaplain Horst asserts that they are wholly false, Warden Hill, the action officer in charge of the decision to terminate Senior Chaplain Horst, had not heard about these additional allegations until after Defendants transferred and terminated Senior Chaplain Horst.

158.    In other words, Senior Chaplain Horst was terminated solely on the basis of his request to be accommodated for his sincere religious convictions and not the post-hoc pretextual (and false) allegations against him.

## VIII.    Despite Defendants Informing Senior Chaplain Horst that He was Under Investigation, the IG's Office Did Not Conduct An Investigation.

159.    Warden Hill was the action officer tasked with determining whether to terminate Senior Chaplain Horst from the Department of Corrections.

160.    Warden Hill never received a report of investigation from the DOC IG Office.

161.    No member of the Department spoke to Warden Hill about an investigation.

162.    Warden Hill did not receive any correspondence from the DOC IG.

163.    Warden Hill never received a finding from the DOC IG that Senior Chaplain Horst's actions amounted to *actual* discrimination. Nor could they because Senior Chaplain Horst's actions were lawful requests for a religious accommodation and not discriminatory in any manner.

164.    Warden Hill never received a request for a response from the EEOC, nor did she receive any correspondence from the EEOC regarding this case.

165.    Thus, despite Defendants' assertion that Senior Chaplain Horst was transferred from MCI to HCI due to an ongoing investigation into Senior Chaplain Horst's alleged wrongdoing, the IG's Office did not conduct an investigation.

166.    Apart from a flagrant violation of their own rules, the only reason the IG's Office does not conduct investigations is if the office deems the report not credible or the allegation not amounting to *actual* discrimination.

167.    Despite the lack of an investigation, Warden Hill decided to terminate Senior Chaplain Horst.

168.    On November 14, 2024, Defendants issued Senior Chaplain Horst a Notice of Intent and Right to a Predetermination Conference – Dismissal letter. Ex. 10.

169.    The Defendants made eleven allegations against Senior Chaplain Horst in the notice letter, all of which are listed below.

170.    Alleged offense number 1 stated as follows:

Alleged Offense #1: Violation of Department of Corrections Rule 33-208.001(4)(a), F.A.C.:

No Administrator, warden, Officer-in-Charge, Supervisor, or other employee shall knowingly permit any subordinate, inmate or other person to, nor shall he, commit any act or engage in any conduct which would violate any state statute, rule, directive or policy statement. The administration and enforcement of all such statutes, rules, directives and policy statements, except as may be otherwise provided herein, shall be a basic responsibility of all Administrators, Wardens, Officers-in-Charge and Supervisors.

A true and correct copy of Florida DOC Rule 33-208.001 is attached hereto as EXHIBIT 13 and incorporated herein.

171.    Alleged offense number 2 stated as follows:

Alleged Offense #2: Violation of Department of Corrections Rule 33-208.002(3)(a), F.A.C.:

All employees shall keep themselves physically fit and mentally alert, shall perform their duties fairly and impartially, and shall conduct

themselves both on-duty and off-duty so as to command the respect of fellow employees, inmates, offenders subject to community supervision, and the general public. Each employee's conduct shall at all times maintain proper security and welfare of Department institutions, facilities, grounds, buildings, property, inmates, offenders subject to community supervision.

A true and correct copy of Florida DOC Rule 33-208.002 is attached hereto as EXHIBIT 14 and incorporated herein.

172.   Alleged offense number 3 stated as follows:

Alleged Offense #3: Violation of Department of Corrections Rule 33-208.002(10), F.A.C.:

No employee shall be insubordinate, neglectful, or unwilling to follow lawful orders or perform officially designated duties.

Ex. 14.

173.   Alleged offense number 4 stated as follows:

Alleged Offense #4: Violation of Department of Corrections Rule 33-208.003(22), F.A.C.:

Conduct Unbecoming a Public Employee or Failing to Maintain a Proper Level of Professionalism.

A true and correct copy of Florida DOC Rule 33-208.003 is attached hereto as Exhibit 15 and incorporated herein.

174.   Alleged offense number 5 stated as follows:

Alleged Offense #5: Violation of Department of Corrections Rule 33-208.003(24), F.A.C.:

Willful Violation of Rules, Procedures, Post Orders, Regulations, Directives or Policy Statements.

Ex. 15.

175.    Alleged offense number 6 stated as follows:

Alleged Offense #6: Violation of Department of Corrections Rule 33-208.003(26). F.A.C.:

Insubordination.

Ex. 15.

176.    Alleged offense number 7 stated as follows:

Alleged Offense #7: Violation of Department of Corrections Rule 33-208.003(39), F.A.C.:

Discrimination and/or Harassment on the Job.

Ex. 15.

177.    Alleged offense number 8 stated as follows:

Alleged Offense #8: Violation of Department of Management Services Rule 60L-36.005(3)(d), F.A.C.:

Insubordination. Employees shall follow lawful orders and carry out the directives of persons with duly delegated authority. Employees shall resolve any differences with management in a constructive manner.

A true and correct copy of Department of Management Services Rule 60L-36.005(3)(e), F.A.C. is attached hereto as Exhibit 16 and incorporated herein.

178.    Alleged offense number 9 stated as follows:

Alleged Offense #9: Violation of Department of Management Services Rule 60L-36.005(3)(e), F.A.C.:

Violation of law or agency rule. Employees shall abide by the law and applicable rules and policies and procedures, including those of the employing agency and the rules of the State Personnel System. All employees are subject to Part III of Chapter 112, Florida Statutes, governing standards of conduct, which agencies shall make available to employees. An agency may determine that an employee has violated

the law even if the violation has not resulted in arrest or conviction. Employees shall abide by both the criminal law, for example, drug laws, and the civil law, for example, laws prohibiting sexual harassment and employment discrimination.

Ex. 16.

179.   Alleged offense number 10 stated as follows:

Alleged Offense #10: Violation of Department of Management Services Rule 60L-36.005(3)(f), F.A.C.:

Conduct unbecoming a public employee. Employees shall conduct themselves, on and off the job, in a manner that will not bring discredit or embarrassment to the state.

Ex. 16.

180.   Alleged offense number 11 stated as follows:

Alleged offense #11: Violation of Department of Management Services Rule 60L-36.005(3)(g), F.A.C.:

Misconduct. Employees shall refrain from conduct which, though not illegal or inappropriate for a state employee generally, is inappropriate for a person in the employee's particular position. For example, cowardice may be dishonorable in people generally, but it may be entirely unacceptable in law enforcement officers. By way of further example, people are generally free to relate with others, but it may be entirely unacceptable for certain employees to enter into certain relations with others, such as correctional officers with inmates.

Ex. 16.

181.   Despite the language included in Defendants' trumped-up termination notice, each of these charges were associated with Senior Chaplain Horst's refusal to proctor Chaplain Jane Doe ICPT CPE.

IX.   **Defendants Claimed That Accommodating Senior Chaplain Horst's Religious Belief Would Cause An Undue Burden But Implemented Senior Chaplain Horst's Requested Accommodation Immediately After He Was Transferred to HCI.**

182.   Defendants did not attempt to accommodate Senior Chaplain Horst's religious beliefs, nor did they consider any potential accommodation.

183.   Senior Chaplain Horst's original accommodation request asked that Assistant Warden S.B. proctor Chaplain Jane Doe training.

184.   This request was reasonable, available, and would not have been an undue hardship on Defendants.

185.   Before Senior Chaplain Horst's request, Central Office Chaplain B.B. suggested the same accommodation be afforded to Senior Chaplain Horst.

186.   Immediately after Senior Chaplain Horst was transferred to HCI, Defendants implemented this suggested accommodation, employing Assistant Warden S.B. as Chaplain Jane Doe ICPT CPE proctor.

187.   As of May 2025, Assistant Warden S.B. continued to serve as Chaplain Jane Doe proctor.

X.   **Senior Chaplain Horst Filed a Second Accommodation Request, Which Warden Hill Confirmed Receiving, Yet, Again, Defendants Failed to Consider an Accommodation.**

188.   On November 19, 2024, Senior Chaplain Horst sent, and Warden Hill received, a letter titled, "Prison Chaplain Religious Accommodation

Request/Predetermination Conference Requests." A true and correct copy of Plaintiff's Second Request for Religious Accommodation is attached hereto as EXHIBIT 17 and incorporated herein.

189.   The letter is five pages long, clearly articulates relevant legal standards associated with this case, and establishes that Defendants were aware that Senior Chaplain Horst's termination would violate state and federal law. The request includes the following:

> As you know, [Senior Chaplain Horst] serves at Madison Correctional Institution (MCI). Chaplain Horst has requested a religious accommodation from leadership at MCI regarding certain proctoring duties on the basis of his sincerely held religious beliefs. The request may be readily accommodated via several options, but instead FL DOC has treated [Senior Chaplain Horst's] religious accommodation request as 'insubordination' and 'discrimination' and has actioned a dismissal of [Senior Chaplain Horst]. The threatened adverse employment action and termination should be withdrawn and reasonable accommodation should be given. The investigation of [Senior Chaplain Horst]; relocation of [Senior Chaplain Horst], and now, notice of intent of termination for [Senior Chaplain Horst], under the facts as we understand them, could reasonably constitute a pattern of adverse employment action, and thus could subject FL DOC to liability for civil rights violations.

Ex. 17.

190.   Warden Hill reviewed this second written religious accommodation request and forwarded it to Human Resources but did not respond to the letter.

191.   No religious accommodation was provided to Senior Chaplain Horst, and Defendants did not engage in the interactive accommodation process with Senior Chaplain Horst.

## XI.    Senior Chaplain Horst Made A Third Request for Religious Accommodation During His Predetermination Conference.

192.   On December 5, 2024, Senior Chaplain Horst was subjected to a Predetermination Conference in Warden Hill's office at MCI.

193.   During this predetermination conference, Senior Chaplain Horst via his legal counsel, verbally made a third request for religious accommodation.

194.   Despite Senior Chaplain Horst's several requests, on December 12, 2024, Defendants terminated Senior Chaplain Horst without engaging in any interactive accommodation process or providing him with a legally required accommodation for his sincerely held religious beliefs. Ex. 1.

195.   Defendants were required to attach all evidence supporting Senior Chaplain Horst's dismissal to the "Final Action Letter for Disciplinary Action – Dismissal." There was no investigation attached to the letter. Ex. 1.

## XII.    Regional Chaplain A.H. Screened the Beliefs of Applicants for Senior Chaplain Horst's Senior Chaplain Position to Ensure they do not Hold Religious Beliefs Similar to Senior Chaplain Horst.

196.   Senior Chaplain Horst's leadership has made clear that they would not have hired Senior Chaplain Horst if they were aware of his religious beliefs.

197.   After Senior Chaplain Horst's termination, Regional Chaplain A.H. screened future applicants for the MCI Senior Chaplain position for their religious beliefs. In other words, Defendants noted that they would unlawfully refuse to hire anyone who held Senior Chaplain Horst's sincere religious beliefs in the future as a matter of policy for the Department.

198.   Prior to Senior Chaplain Horst's termination, Regional Chaplain A.H. asked applicants a series of stock questions drafted by Defendants.

199.   After Senior Chaplain Horst was dismissed, A.H. decided to add additional questions to identify Christians that shared Senior Chaplain Horst's religious beliefs to ensure no similar requests for accommodation would arise again the future.

200.   Defendants' no religious accommodation for Senior Chaplain's is a patently unlawful policy and resulted in the unlawful termination of Senior Chaplain Horst from his employment.

201.   Regional Chaplain A.H. has taken the position that he cannot employ an Orthodox Jew, Muslim, or Christian that has a religious belief that, in his opinion, would impact the applicant's ability to supervise a female chaplain.

XIII.    **Accommodating Senior Chaplain Horst's Religious Beliefs Would Not Cause Defendants an Undue Burden.**

202.    Senior Chaplain Horst's request that any other Chaplain or Assistant Warden proctor Chaplain Jane Doe training did not create an undue burden for Defendants.

203.    Senior Chaplain Horst specifically mentioned Assistant Warden S.B. as a viable proctor alternative because Central Office Chaplain B.B. initially suggested her for the role.

204.    Warden Hill stated that Assistant Warden S.B. serving as Chaplain Jane Doe proctor was an undue burden because it would inconvenience S.B. and it is not her job.

205.    Mere inconvenience is an insufficient basis to refuse providing an employee a religious accommodation.

206.    An undue hardship at a minimum is something hard to bear, and inconvenience of a supervisor does not meet that threshold.

207.    The accommodation Senior Chaplain Horst requested was implemented. The accommodation did not cause Defendants undue hardship.

208.    Senior Chaplain Horst's constitutional rights and religious freedom do not yield to the inconvenience of state agency supervisors.

209.    Assistant Warden S.B. was not the only employee available to proctor Chaplain Jane Doe's non-mandatory ICPT CPE.

210.   Chaplain J.M. was available to proctor her training and he was in the same prison as Chaplain Jane Doe.

211.   Regional Chaplain A.H. could have served as Chaplain Jane Doe's proctor.

212.   And Central Office Chaplain B.B. identified fourteen chaplains at nearby institutions that could all have served as Chaplain Jane Doe's proctor.

213.   Any of these available alternative proctors would have accommodated Senior Chaplain Horst's religious beliefs, while providing Chaplain Jane Doe with her requested training.

214.   Defendants refused to afford Senior Chaplain Horst any of the reasonable and plainly available accommodations that would have imposed no undue hardship on Defendants.

## XIV.   Defendants Actions Have Caused and are Continuing to Cause Irreparable Injury to Senior Chaplain Horst and His First and Fourteenth Amendment Rights.

215.   Senior Chaplain Horst's speech, expression, and religious exercise were substantially burdened and injured by being subjected to Defendants' unlawful actions, employment practices, and open hostility towards his religious beliefs.

216.   Defendants' unlawful termination of Senior Chaplain Horst was impermissibly based on Senior Chaplain Horst's speech, expression, and religious exercise.

217.    Defendants' termination of Senior Chaplain Horst imposed irreparable constitutional injury on Senior Chaplain Horst's protected speech.

218.    Defendants' termination of Senior Chaplain Horst imposed irreparable constitutional injury on Senior Chaplain Horst's protected expression.

219.    Defendants' termination of Senior Chaplain Horst imposed irreparable constitutional injury on Senior Chaplain Horst's protected religious exercise.

220.    Defendants' termination of Senior Chaplain Horst imposed irreparable constitutional injury on Senior Chaplain Horst's rights to equal protection under the law.

221.    Defendants' open hostility towards Senior Chaplain Horst's religious beliefs establishes a disfavored religion and unlawfully and excessively entangles the government with religion.

222.    Defendants hiring practices establish a disfavored religion and unlawfully and excessively entangle the government with religion.

# CLAIMS FOR RELIEF

## COUNT I
### VIOLATION OF TITLE VII, 42 U.S.C. §2000e, et seq.
### Religious Discrimination – Failure to Accommodate

223.  Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1–222.

224.  Title VII requires an employer to reasonably accommodate an employee's religious observances and practices unless it causes undue hardship on the conduct of the employer's business. *See* 42 U.S.C. §2000e-(j).

225.  Senior Chaplain Horst holds bona fide religious beliefs that preclude him from proctoring Chaplain Jane Doe non-mandatory ICPT CPE because doing so would require endorsing, spiritually supporting, and participating in a female Christian minister, ministering to males in a place of worship.

226.  Senior Chaplain Horst informed Defendants of his religious beliefs and requested a reasonable accommodation.

227.  Defendants failed to engage in a bilateral, individual, and cooperative process with Senior Chaplain Horst regarding Senior Chaplain Horst's religious accommodation request.

228.  Defendants failed to accommodate Senior Chaplain Horst's religious observances and practices.

229.   Defendants took adverse employment action against and discharged Senior Chaplain Horst for refusing to violate his religious beliefs, requesting an accommodation, and reporting discrimination.

230.   Senior Chaplain Horst's religious beliefs regarding proctoring, and thus endorsing, a female chaplain's ICPT CPE is the basis for Defendant's discriminatory treatment.

231.   Accommodating Senior Chaplain Horst's religious beliefs, as required by state and federal law, would not have resulted in an undue hardship on Defendant's or their operations.

232.   It is not an undue hardship to comply with state and federal law.

233.   Defendants' refusal to accommodate Senior Chaplain Horst's religious beliefs was intentional, deliberate, willful, malicious, reckless, and done with callous disregard for Senior Chaplain Horst's rights.

234.   As a result of Defendants' failure to accommodate Senior Chaplain Horst's religious beliefs, Senior Chaplain Horst has suffered and continues to suffer actual damages and concrete harm, including lost earnings, lost benefits, and other financial loss.

235.   As a result of Defendants' failure to accommodate Senior Chaplain Horst's religious beliefs, Senior Chaplain Horst has suffered and continues to suffer

from humiliation, embarrassment, emotional and physical distress, and mental anguish.

236.   Senior Chaplain Horst is thus entitled to all legal and equitable remedies under Title VII, including compensatory and punitive damages.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT II
### VIOLATION OF TITLE VII, 42 U.S.C. §2000e-2
### Religious Discrimination – Disparate Treatment

237.   Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1–222.

238.   Title VII makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of religion. 42 U.S.C. §2000e-2(a)(1).

239.   Senior Chaplain Horst belongs to a protected class of employees with bona fide religious objections to endorsing and participating in female chaplain Christian ministry training.

240.   Defendants engaged in an intentional, organization-wide and systemic policy, pattern, and practice of religious discrimination against Senior Chaplain Horst by, among other actions, refusing to consider or provide religious accommodation mandate by state law; failing to reasonably accommodate Senior

Chaplain Horst's bona fide religious beliefs; discriminatorily pressuring Senior Chaplain Horst to forego his religious beliefs and conscience; and other forms of discrimination.

241.   At a minimum, by imposing the mandate on Senior Chaplain Horst that he endorse and proctor a female chaplain's ICPT CPE, Defendants intentionally discriminated against Senior Chaplain Horst on the basis of his religious beliefs.

242.   Defendants' intentionally disparate treatment was motivated by discriminatory animus toward Senior Chaplain Horst's sincere religious objections to female's ministering to men, and more generally the Bible, especially as it describes gender roles within Christian ministry.

243.   Defendants implemented policies that require its institutions to accommodate employees' religious beliefs, yet Defendants treated Senior Chaplain Horst differently from, and less preferentially than, similarly situated employees with religious objections by failing to accommodate, or even attempting to accommodate his religious beliefs.

244.   As a result of Defendants' disparate treatment, Senior Chaplain Horst suffered adverse employment actions—including transfer from MCI to HCI, the emotional pain associated with the false claims from his supervisors that his actions required a formal investigation, the emotional and reputational damage associated

with Senior Chaplain Horst's Career Service Appeal, and ultimately his termination from MCI.

245.   Defendants have failed to prevent, respond to, investigate, and/or appropriately resolve its policy and practice of religious discrimination.

246.   Defendants did not properly report or investigate Senior Chaplain Horst's claim of religious discrimination.

247.   Defendants' disparate treatment has been intentional, deliberate, willful, malicious, reckless, in callous disregard to Senior Chaplain Horst's rights.

248.   Because of the continuous nature of Defendants' discriminatory policy and practice, Senior Chaplain Horst is entitled to application of the continuing violations doctrine to all violations alleged in this Verified Complaint.

249.   As a result of Defendants' disparate treatment, Senior Chaplain Horst has suffered and continues to suffer concrete and actual damages and harm, including lost earnings, lost benefits, and other financial loss.

250.   As a further result of Defendants' unlawful disparate treatment, Senior Chaplain Horst has suffered and continues to suffer damages, humiliation, embarrassment, emotional and physical distress, and mental anguish.

251.   Senior Chaplain Horst is thus entitled to all legal and equitable remedies under Title VII, including compensatory damages.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT III
### VIOLATION OF TITLE VII, 42 U.S.C. §2000e-2
### Religious Discrimination – Wrongful Termination

252.   Plaintiff re-allege and incorporate by reference each allegation set forth in paragraphs 1–222.

253.   Title VII makes it unlawful for an employer "to discharge any individual … because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1).

254.   At the time of the discrimination, Senior Chaplain Horst was Defendants' employee—qualified in all respects to do his job competently—with sincere religious objections to endorsing and proctoring a religious practice contrary to the Bible.

255.   Defendants terminated Senior Chaplain Horst after he refused to violate his conscience by endorsing and proctoring a female chaplain's religious training.

256.   Defendants' termination of Senior Chaplain Horst was an adverse employment action that materially and adversely changed the overall terms and conditions of his employment, in violation of Title VII.

257.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, in callous disregard for Senior Chaplain Horst's rights.

258.   As a result of Defendants' wrongful termination of Senior Chaplain Horst, he has suffered and continues to suffer actual and concrete damages and harm, including but not limited to lost earnings, lost benefits, and other financial loss.

259.   As a further result of Defendants' wrongful termination of Senior Chaplain Horst, he has suffered and continue to suffer damages, humiliation, embarrassment, emotional and physical distress, and mental anguish.

260.   Therefore, Senior Chaplain Horst is entitled to all legal and equitable remedies under Title VII, including compensatory damages.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

**COUNT IV**
**VIOLATION OF TITLE VII, 42 U.S.C. §2000e-3(a)**
**Religious Discrimination – Retaliation**

261.   Plaintiffs re-allege and incorporate by reference each allegation set forth in paragraphs 1–222.

262.   Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

263.    Senior Chaplain Horst engaged in protected activities when, among other actions, he (1) requested a religious accommodation; (2) objected to S.B. and A.H.'s demand that he violate his sincerely held religious beliefs; and (3) informed Defendants about the illegality of Defendants' demand under Federal and State law.

264.    Senior Chaplain Horst suffered a materially adverse employment action when Defendants, among other actions, (1) failed to respond to Senior Chaplain Horst's accommodation request; (2) transferred Senior Chaplain Horst for an alleged investigation that was never conducted; (3) informed Senior Chaplain Horst that he was being placed under investigation; and (4) terminated Senior Chaplain Horst's employment.

265.    The threat of job loss would normally dissuade a reasonable worker from filing a discrimination complaint, and Senior Chaplain Horst's requested (and rejected) accommodation is causally related to the adverse employment action.

266.    Further, Senior Chaplain Horst has a good faith, reasonable belief that Defendants were engaged in unlawful employment practices by, among other actions, refusing to accommodate its employees' religious observances and practices.

267.    In light of the facts, Senior Chaplain Horst's beliefs were objectively reasonable.

268.    Defendant retaliated against Senior Chaplain Horst for objecting to violating his religious beliefs by placing him under investigation, transferring him, and ultimately terminating his employment.

269.    Defendants' actions thus constituted unlawful retaliation in violation of Title VII.

270.    As a result of Defendants' unlawful retaliation, Senior Chaplain Horst has suffered and continues to suffer actual and concrete damages and harm, including lost earnings, lost benefits, and other financial loss.

271.    As a further result of Defendants' unlawful retaliation, Senior Chaplain Horst has suffered and continues to suffer damages, humiliation, embarrassment, emotional and physical distress, and mental anguish.

272.    Senior Chaplain Horst is thus entitled to all legal and equitable remedies available for Title VII violations, including compensatory damages.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

### COUNT V
### VIOLATION OF FLORIDA RELIGIOUS FREEDOM RESTORATION ACT
### Florida Statute 761.03 – Religious Discrimination

273.    Senior Chaplain Horst hereby alleges and adopts each and every allegation in paragraphs 1–222 above as if fully set forth herein.

274.   The Florida Religious Freedom Restoration Act (FL RFRA), §761.03, Florida Statutes (2025c), provides:

(1) The government shall not substantially burden a person's religion, even if the burden results from a rule of general applicability, except that government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person:
> (a) Is in furtherance of a compelling governmental interest; and
> (b) Is the least restrictive means of furthering that compelling government interest.

(2) A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.

§761.03, Fla. Stat. (2025c).

275.   Section 761.02 defines "Government" or "state" to include "any branch, department, agency, instrumentality, or official or other person acting under color of law of the state, a county, special district, municipality, or any other subdivision of the state." §761.02(1), Fla. Stat. (2025c).

276.   Section 3 of Chapter 761.02 defines "exercise of religion" to mean "an act or refusal to act that is substantially motivated by a religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief." § 761.02(3), Fla. Stat. (2025c).

277.   FL RFRA demands that, should the government substantially burden a person's free exercise of religion, it bears the burden of demonstrating that its burden

on religious exercise furthers a compelling government interest and is the least restrictive means of achieving that compelling government interest. §761.03, Fla. Stat. (2025c).

278.   FL RFRA plainly applies to Defendants, as they constitute a "branch, department, agency, instrumentality, or official or other person acting under color of law of the state, a county, special district, municipality, or any other subdivision of the state." §761.02(1), Fla. Stat. (2025c).

279.   Florida Statute 761.04 that "[t]he prevailing plaintiff in any action or proceeding to enforce a provision of this act is entitled to reasonable attorney's fees and costs to be paid by the government."

280.   Florida courts have made clear that federal RFRA precedent is instructive when assessing conflicts involving FLRFRA. The difference between the two is that "the [Florida Religious Freedom Restoration Act] is necessarily broader than United States Supreme Court precedent, which holds that the 'right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability.'" *Warner v. City of Boca Raton*, 887 So.2d 1023 (Fla. 2004) (quoting *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990)).

281.   "RFRA operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020).

282.    Congress enacted RFRA "to provide very broad protections for religious liberty," going "far beyond what [the Supreme Court] has held is constitutionally required" under the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 706 (2014).

283.    Congress has mandated that RFRA "'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 583 U.S. 696 (quoting 42 U.S.C. §2000cc-3(g)).

284.    Senior Chaplain Horst has sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that he is to follow its teachings.

285.    Senior Chaplain Horst has, and exercises sincerely held religious beliefs which compel him to abstain from proctoring, or otherwise endorsing, a female chaplain's ICPT training.

286.    While Defendants' policies require that they accommodate religious beliefs, Defendants made no attempt to accommodate Senior Chaplain Horst's request for religious beliefs.

287.    Defendants demanded Senior Chaplain Horst violate his sincerely held religious beliefs, in violation of FL RFRA.

288.  Defendants' refusal to accommodate, or even consider accommodating Senior Chaplain Horst's religious beliefs, placed Senior Chaplain Horst in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

289.  By forcing Senior Chaplain Horst into the unconscionable choice between violating his sincerely held religious convictions or resigning from his employment, Defendants' mandate constitutes a substantial burden on Senior Chaplain Horst's exercise of religion.

290.  There is no legitimate, rational, or compelling interest in Defendants mandating Senior Chaplain Horst, rather than the many other qualified employees within the FDC, proctor and endorse a female chaplain's ICPT training.

291.  Forcing Senior Chaplain Horst to proctor and endorse a female chaplain's ICPT training is not the least restrictive means of achieving an otherwise permissible government interest.

292.  Defendants' mandate that Senior Chaplain Horst proctor Chaplain Jane Doe's ICPT training or resign, has caused, is causing, and will continue to cause Plaintiff irreparable harm and actual and undue hardship on Senior Chaplain Horst's sincerely held religious beliefs.

293.  Senior Chaplain Horst has no adequate remedy at law for the continuing deprivation of his constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VI
## VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

294.    Senior Chaplain Horst hereby alleges and adopts each and every allegation in paragraphs 1–222 above as if fully set forth herein.

295.    The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

296.    The Establishment Clause also prohibits the government from showing hostility towards religion and prohibits showing favoritism towards one religious sect over another or between non-religion and religion.

297.    Defendants' hiring practices are impermissibly hostile towards individuals who share Senior Chaplain Horst's religious beliefs.

298.    Defendants' have impermissibly shown favoritism towards particular religious beliefs, and secularism, over Senior Chaplain Horst's religious beliefs.

299.    Defendants' hiring practices and discriminatory treatment of Senior Chaplain Horst show excessive entanglement of the government with religion.

300.    Defendants' hiring practices and discriminatory treatment of Senior Chaplain Horst purport to inform Chaplains of how they may worship and engage

in their religious freedom, and what they may believe while employed for Defendants.

301.   Defendants' hiring practices and discriminatory treatment of Senior Chaplain Horst place a content and viewpoint-based limitation on religious exercise and provide a government imprimatur for only certain forms of permissible religious beliefs, exercise, and expression.

302.   As a direct and proximate result of Defendants' violation of the Establishment Clause of the First Amendment, Senior Chaplain Horst has suffered, is suffering, and will continue to suffer irreparable harm for the loss of his cherished constitutional rights.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VII
## VIOLATION OF THE FREE SPEECH CLAUSE OF THE
## FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Retaliation

303.   Senior Chaplain Horst hereby realleges and adopts each and every allegation contained in paragraphs 1–222 above as if fully set forth herein.

304.   The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Senior Chaplain Horst's freedom of speech.

305.   By punishing Senior Chaplain Horst for expressing his views regarding Christianity, Defendants have retaliated and are retaliating against Senior Chaplain Horst for exercising his First Amendment rights.

306.   When Senior Chaplain Horst was engaging in speech related to his religion's interpretation of the Bible, he was engaged in expression the First Amendment protects.

307.   Senior Chaplain Horst, as a Chaplain, has an interest in discussing matters of public concern, including religion, Christian worship, and the interpretation of scripture.

308.   Senior Chaplain Horst's speech on matters of public concern have never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

309.   In fact, if Senior Chaplain Horst were to violate his religious beliefs it is unlikely he would be able to perform or manage the affairs of Defendants' MCI Chapel, as inmates would be unwilling to seriously consider Senior Chaplain Horst a representative of the Christian community if he were to live his life as a hypocrite, in violation of scripture.

310.   Defendants' retaliatory and unconstitutional actions taken against Senior Chaplain Horst would deter a person of ordinary firmness from exercising their right to free speech in the future.

63

311.   Defendants' retaliatory and unconstitutional actions taken against Senior Chaplain Horst constitute adverse employment actions.

312.   Defendants took these retaliatory and unconstitutional actions against Senior Chaplain Horst at least in part because of the views he has expressed on matters of public concern that were related to religious doctrine and Christianity, expression that the First Amendment protects.

313.   Defendants subjected Senior Chaplain Horst to adverse employment actions due to the content and viewpoint of Senior Chaplain Horst's speech.

314.   Defendants' retaliatory and unconstitutional actions violate Senior Chaplain Horst 's right to free speech as guaranteed by the First Amendment to the United States Constitution.

315.   As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Senior Chaplain Horst has suffered, is suffering, and will continue to suffer irreparable harm for the loss of his cherished constitutional rights.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VIII
## VIOLATION OF THE FREE SPEECH CLAUSE OF THE
## FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Content and Viewpoint Discrimination

316.   Senior Chaplain Horst hereby alleges and adopts each and every allegation in paragraphs 1–222 above as if fully set forth herein.

317.   Defendants, by taking adverse employment action against Senior Chaplain Horst for expressing his views regarding matters of public concern, including religion, Christian worship, and the interpretation of scripture, Defendants have engaged in content and viewpoint discrimination in violation of the First Amendment.

318.   Defendants chose to take adverse employment action against Senior Chaplain Horst because of the content of viewpoint of his speech.

319.   Defendants retain unbridled discretion to discriminate based on content and viewpoint.

320.   Defendants exercised their unbridled discretion when they punished Senior Chaplain Horst for expressing his views regarding matters of public concern, including religion, Christian worship, and the interpretation of scripture.

321.   Defendants' unconstitutional actions taken against Senior Chaplain Horst are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

322.  The overbreadth of Defendants' retaliatory and unconstitutional actions taken against Senior Chaplain Horst chills the speech of Senior Chaplain Horst and all those employees who seek to engage in protected expression in and out of Defendants' prisons.

323.  Senior Chaplain Horst's expression regarding matters of public concern, including religion, Christian worship, and the interpretation of scripture is protected by the First Amendment.

324.  By taking adverse employment action against Plaintiff, Defendants have punished him for engaging in protected First Amendment expression.

325.  As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Senior Chaplain Horst has suffered, is suffering, and will continue to suffer irreparable harm for the loss of his cherished constitutional rights.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT IX
## VIOLATION OF THE FREE EXERCISE CLAUSE OF THE
## FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

326.  Senior Chaplain Horst hereby alleges and adopts each and every allegation in paragraphs 1–222 above as if fully set forth herein.

327.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiff's right to free exercise of religion.

328.   The Free Exercise Clause of the First Amendment protects against "[p]enalties on the free exercise of religion." *Carson as next friend of O.C.* v. *Makin*, 596 U.S. 767, 778 (2022).

329.   The Free Exercise Clause prohibits the government from acting with hostility toward religious beliefs or practices, and it protects against both overt and covert discrimination based on religious status or beliefs. *See Masterpiece Cakeshop* v. *Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018); *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 534 (1993).

330.   "The Free Exercise Clause provides that 'Congress shall make no law… prohibiting the free exercise' of religion." *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting U.S. Const. Amdt. 1.) "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U.S. 872, 877 (1990)).

331.   Defendants targeted Senior Chaplain Horst on account of his bona fide religious beliefs for disparate and discriminatory treatment because Defendants perceived Senior Chaplain Horst's religious beliefs to be incompatible or in tension with Defendants' preferred worldview.

332.   Defendants discriminated against Senior Chaplain Horst for living out his faith in his daily life.

333.   Defendants failed to protect Senior Chaplain Horst's ability to live out his faith in his daily life.

334.   Defendants' hiring practices prevent potential employees from living out their faiths in daily life by discriminating against those who share Senior Chaplain Horst's Christian worldview.

335.   Senior Chaplain Horst has no adequate remedy at law to protect against the continuing deprivation of his most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT X
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

336.   Senior Chaplain Horst hereby alleges and adopts each and every allegation in paragraphs 1–222 above as if fully set forth herein.

337.   By punishing Senior Chaplain Horst for expressing his views regarding religion, Christian worship, and the interpretation of scripture when they would not punish chaplains who express the opposite views on the same subjects, Defendants have violated and are violating Senior Chaplain Horst's right to equal protection of the law under the Fourteenth Amendment.

338.   Senior Chaplain Horst is similarly situated to other chaplains employed for Defendants.

339.   Defendants have taken no adverse employment actions against chaplains who support females ministering to male prisoners, but they have taken adverse employment action against Senior Chaplain Horst for his, and his religion's interpretation of Scripture which does not support this practice.

WHEREFORE, Senior Chaplain Horst respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Senior Chaplain Horst respectfully prays that the Court:

A.      That the Court enter a Permanent Injunction upon judgment, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Defendants' discriminatory and unlawful employment practices for the Department's chaplains, compelling Defendants to reinstate Senior Chaplain Horst to his previous position with all the rights, privileges, and benefits appertaining thereto; and compelling Defendants to reasonably accommodate the religious beliefs and practices of its employees, including Senior Chaplain Horst, in accordance with the mandates of Title VII, as elucidated by the Supreme Court of the United States in *Groff* v. *DeJoy*, 600 U.S. 447 (2023);

B.      That the Court render a Declaratory Judgment against Defendants, declaring that Defendants' termination of Senior Chaplain Horst's employment was unconstitutional and unlawful, and further declaring that

   1.      Defendants violated Title VII by failing to reasonably accommodate Senior Chaplain Horst's bona fide religious beliefs;

2.    Defendants violated Title VII by intentionally discriminating against Senior Chaplain Horst for his bona fide religious beliefs;

3.    Defendants violated Title VII by wrongfully terminating Senior Chaplain Horst for his sincerely held religious objections to violating his sincerely held religious beliefs when accommodating his belief would not cause Defendants an undue burden;

4.    Defendants violated Title VII by retaliating against Plaintiff for engaging in statutorily protected activities;

5.    Defendants' unlawful, adverse employment actions taken against Senior Chaplain Horst violated his rights under the First and Fourteenth Amendments.

C.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

D.    That the Court restore Senior Chaplain Horst to the status quo ante—that is, reinstate Senior Chaplain Horst to his prior position of employment and restore all benefits, rank, status, and privileges appertaining thereto;

E.    That the Court award Senior Chaplain Horst backpay and other actual damages in an amount to be determined at trial by a jury;

F.      That the Court award Senior Chaplain Horst punitive damages;

Order Defendants to reinstate Senior Chaplain Horst to his previous positions as Senior Chaplain of MCI, with back pay, and restore Plaintiff to his original compensation, terms, conditions, and privileges of employment.

G.      That the Court award Senior Chaplain Horst his reasonable attorney's fees, costs, and other expenses and disbursement in this action under 42 U.S.C. §1988 and  42 U.S.C. §2000e-5(k); and

H.      That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order and final judgment; and

I.      That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all triable issues.

Dated: November 26, 2025                    Respectfully submitted,

/s/ Avery B. Hill
Mathew D. Staver
Horatio G. Mihet
Daniel J. Schmid*
Avery B. Hill
Florida Bar #1059519
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Tel: (407) 875-1776
Fax: (407) 875-0770
court@lc.org
hmihet@lc.org
dschmid@lc.org
ahill@lc.org
*Application for
Admission *pro hac vice*
pending
*Attorneys for Plaintiff*

**VERIFICATION**

I, Michael Horst, am over the age of eighteen and a former employee of the Florida Department of Corrections. I have reviewed the allegations made in this Verified Complaint, and as to those allegations of which I have personal knowledge or pertain to me, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on the exhibits and external sources referenced in the complaint, and I believe them to be true. If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Florida, that the foregoing statements are true and correct to the best of my knowledge.

Dated: November 24, 2025

/s/ Michael Horst
Michael Horst
(original signature retained by Counsel)

# INDEX OF EXHIBITS

| Exhibit Name | Type | Exhibit Number |
|---|---|---|
| Final Action Letter for Disciplinary Action - Dismissal | Letter | 1 |
| ICPT CPE Clinical Training Guide | Document | 2 |
| Chaplain Jane Doe and B.B. Emails | Emails | 3 |
| Chaplain Jane Doe Incident Report | Document | 4 |
| Chaplain Jane Doe Email to Plaintiff and S.B. | Emails | 5 |
| B.B.'s Emails to S.B. | Emails | 6 |
| Plaintiff's Incident Report | Document | 7 |
| Plaintiff's First Request for Religious Accommodation | Document | 8 |
| S.B.'s First Incident Report | Document | 9 |
| S.B.'s Second Incident Report | Document | 10 |
| A.H.'s Incident Report | Document | 11 |
| Notice of Intent and Right to a Predetermination Conference | Letter | 12 |
| Rule 33-208.001 | Policy | 13 |
| Rule 33-208.002 | Policy | 14 |
| Rule 33-208.003 | Policy | 15 |
| Rule 60L-36.005 | Policy | 16 |
| Plaintiff's Second Request for Religious Accommodation | Letter | 17 |
| Florida DOC Procedure 208 | Policy | 18 |